2013 WL 10129246
Only the Westlaw citation is currently available.
United States District Court,
W.D. Tennessee,
Western Division.

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION, Plaintiff,
v.
NEW BREED LOGISTICS, Defendant.

No. 10–2696–STA–tmp.
|
Signed April 26, 2013.

**Attorneys and Law Firms**

Anica C. Jones, Equal Employment Opportunity Commission, Nashville, TN, Faye A. Williams, Joseph M. Crout, Kelley R. Thomas, Matthew H. McCoy, Equal Employment Opportunity Commission, Memphis, TN, for Plaintiff.

Delaine R. Smith, Asia Nicole Diggs, Louis P. Britt, III, Ford & Harrison LLP, Memphis, TN, Jason Keith Priebe, Ada W. Dolph, Christopher J. Degroff, Gerald L. Pauling, Rebecca Sharon Bromet, Seyfarth Shaw, Chicago, IL, for Defendant.

**ORDER GRANTING PLAINTIFF'S MOTION *IN LIMINE***

S. THOMAS ANDERSON, District Judge.

*\*1* Before the Court is Plaintiff Equal Employment Opportunity Commission's ("EEOC") Motion *in Limine* (D.E.# 168) asking the Court to exclude evidence of Tiffany Pete's ("Pete") bankruptcy filings, personal calendar, and unemployment benefits; filed April 16, 2013. Defendant New Breed Logistics ("New Breed") filed a Response (D.E.# 193) on April 23, 2013. For the reasons stated herein, the Court **GRANTS** EEOC's Motion *in Limine.*

EEOC contends the Court should exclude Pete's bankruptcy filings as irrelevant. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable that it would be without the evidence; and (b) the fact is of consequence in determining the action." [1] "Relevant evidence is admissible unless any of the following provides otherwise ... these rules [.]" [2]

New Breed argues it wishes to present a defense of judicial estoppel and that Pete's bankruptcy petitions are highly probative towards that defense. However, judicial estoppel is an affirmative defense. [3] "In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including ... estoppel[.]" [4] New Breed made no mention of judicial estoppel in its Answer to EEOC's Amended Complaint. [5] New Breed made no attempt to amend its Answer to add such a defense. New Breed attempted to reserve further affirmative defenses as might become apparent through discovery in its Answer. [6] However, the Court granted summary judgment for EEOC on the issue of whether New Breed could reserve undefined defenses in this manner and instructed New Breed that the proper way to assert such defenses was through amendment of its Answer. [7] Therefore, judicial estoppel is not an issue in this trial, and the Court looks with disfavor on any attempt by New Breed to raise it at this late date.

New Breed further maintains it wishes to present Pete's bankruptcy petitions as evidence of Pete's motivations in filing her complaints. As noted in a previous order, the Court finds evidence of financial troubles irrelevant to the issue of motive in filing a complaint with EEOC—it seems beyond dispute that a person who stands to gain financially has a motive to sue, whether or not they are in financial distress. [8] New Breed cites to two out-of-circuit and inapposite cases for the proposition that evidence of financial distress is relevant to motive: *Kostelec v. State Farm Fire & Cas. Co.* [9] and *Lube v. Travelers Indem. Co.* [10] Both cases involve admission of evidence of financial distress as relevant to motive for arson; what neither case does is hold evidence of financial distress is relevant to motive for filing a lawsuit.

Finally, New Breed argues the Court should allow it to introduce Pete's bankruptcy filings as relevant to the source of Pete's emotional distress. The Court finds this evidence to be irrelevant to that issue. Although New Breed cites a 10th Circuit case where it was proper to admit evidence of a prior bankruptcy, [11] the Court finds the issues and facts in this case sufficiently distinguishable so as to consider this authority unpersuasive. In *York,* the plaintiff had filed bankruptcy in 1985 and claimed emotional distress over discriminatory treatment she received in 1992. Here, Pete filed bankruptcy

*after* New Breed's allegedly discriminatory acts. Her financial distress could, in large part, be caused by the loss of her job. To argue Pete's bankruptcy filings are somehow relevant to emotional distress separate than that caused by New Breed's allegedly discriminatory actions seems tenuous at best, and disingenuous at worst.

***2** Since this proffered evidence is irrelevant to any issue in dispute, the Court **GRANTS** EEOC's Motion *in Limine* with respect to Pete's bankruptcy filings.

EEOC argues the Court should exclude Pete's personal calendar as irrelevant to any fact in dispute and that its prejudicial effect would greatly outweigh any probative value it might have. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable that it would be without the evidence; and (b) the fact is of consequence in determining the action." [12] "Relevant evidence is admissible unless any of the following provides otherwise ... these rules[.]" [13] "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice[.]" [14]

New Breed first argues Pete's diary entries are relevant to the issue of whether Pete found James Calhoun's ("Calhoun") statements subjectively offensive, because Pete used certain words in the calendar to describe her own sexual encounters. The Court disagrees. What language Pete may use in her personal documents in relation to her own sexual relationships has no bearing whatsoever on what language she might find offensive in a workplace environment from someone with whom she does not have any sexual relationship.

New Breed next argues Pete's diary entries are relevant to the issue of Pete's attempts to find new work and mitigate damages, as Pete noted certain job interviews in her diary. The Court agrees this evidence is somewhat probative to this issue. However, the Court also notes information regarding Pete's attempts to mitigate is available through other sources, and presentation of the diary may only be cumulative. Even granting some minimal probative value, the potential prejudicial effect on the jury of going through a litany of Pete's sexual encounters greatly outweighs any additional probative value these calendar entries might bring. Therefore, the Court **GRANTS** EEOC's Motion *in Limine* with respect to Pete's calendar.

Finally, EEOC asks the Court to exclude evidence of Pete's receipt of unemployment benefits as irrelevant to any issue in dispute. New Breed indicates it does not oppose EEOC's Motion *in Limine* with respect to this evidence. Therefore, the Court **GRANTS** EEOC's Motion *in Limine* with respect to Pete's receipt of unemployment benefits.

Because Pete's bankruptcy filings are not relevant to any issue in dispute, and because the potentially-prejudicial effect of Pete's calendar greatly outweighs its probative value, the Court **GRANTS** EEOC'S Motion *in Limine* and excludes Pete's bankruptcy filings and calendar. Because New Breed does not oppose EEOC's Motion *in Limine* with respect to Pete's receipt of unemployment benefits, the Court **GRANTS** EEOC's Motion *in Limine* and excludes Pete's receipt of unemployment benefits.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 10129246

---

**Footnotes**

| | |
|---|---|
| 1 | Fed.R.Evid. 401. |
| 2 | Fed.R.Evid. 402. |
| 3 | *See* Stephenson v. Malloy, 700 F.3d 265, 271 n. 6 (6th Cir.2012); Sharp v. Oakwood United Hosps., 458 F.Supp.2d 463, 466 (E.D.Mich.2006). |
| 4 | Fed.R.Civ.P. 8(c)(1). |
| 5 | *See generally* Answer to Amended Complaint, D.E. # 71. |
| 6 | *Id.* ¶ 22. |

| | |
|---|---|
| 7 | Order Granting Plaintiff's Motion for Partial Summary Judgment at 12, D.E. # 141. |
| 8 | In fact, a person in Chapter 13 bankruptcy has a compelling reason *not* to sue, as a sudden influx of money might lead to creditors petitioning to force the debtor into a bankruptcy under Chapter 7. |
| 9 | *Kostelec v. State Farm Fire and Cas. Co.,* 64 F.3d 1220 (8th Cir.1995). |
| 10 | *Lube v. Travelers Indem. Co.,* No. 4:09–CV–00063–WRW, 2009 WL 5185384 (E.D.Ark.2009). |
| 11 | *York v. Am. Tel. & Tel. Co.,* 95 F.3d 948, 957–58 (10th Cir.1996). |
| 12 | Fed.R.Evid. 401. |
| 13 | Fed.R.Evid. 402. |
| 14 | Fed.R.Evid. 403. |

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:17-cv-13292-LVP-EAS ECF No. 122-13 filed 02/27/20 PageID.2942 Page 4 of 16

In re National Prescription Opiate Litigation, Not Reported in Fed. Supp. (2018)

2018 WL 2127807
Only the Westlaw citation is currently available.
United States District Court,
N.D. Ohio, Eastern Division.

IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION

CASE NO. 1:17-MD-2804
|
Signed 05/07/2018

### ORDER REGARDING THIRD-PARTY CONTINGENT LITIGATION FINANCING

DAN AARON POLSTER, UNITED STATES DISTRICT JUDGE

 *1  It has come to the Court's attention that there may be attorneys who represent parties in cases transferred to this MDL Court ("MDL Cases") who have obtained (or are contemplating) third-party contingent litigation financing in connection with those MDL Cases. By "third-party contingent litigation financing" ("3PCL financing"), the Court refers to any agreement under which any person, other than an attorney permitted to charge a contingent fee representing a party, has a right to receive compensation that is contingent on and sourced from any proceeds of an MDL Case, by settlement, judgment, or otherwise. [1]

The Court now **ORDERS** that any attorney in any MDL Case that has obtained 3PCL financing shall:

• share a copy of this Order with any lender or potential lender.

• submit to the Court *ex parte*, for in camera review, the following: (A) a letter identifying and briefly describing the 3PCL financing; and (B) two sworn affirmations—one from counsel and one from the lender—that the 3PCL financing does not: (1) create any conflict of interest for counsel, (2) undermine counsel's obligation of vigorous advocacy, (3) affect counsel's independent professional judgment, (4) give to the lender any control over litigation strategy or settlement decisions, or (5) affect party control of settlement.

The Court further **ORDERS** that attorneys in MDL Cases have a continuing duty to inform the Court if they obtain new or additional 3PCL financing during the pendency of MDL proceedings, and have a continuing duty to update their disclosures and affirmations if circumstances change during the pendency of the MDL proceedings. The Court will deem unenforceable any 3PCL financing agreements that are not compliant with this Order. Further, any attorney or lender whose affirmations prove to be untrue will be subject to sanction by the Court.

Absent extraordinary circumstances, the Court will not allow discovery into 3PCL financing. *See Lambeth Magnetic Structures, LLC v. Seagate Tech. (US) Holdings, Inc.*, 2018 WL 466045 at *5 (W.D. Pa. Jan. 18, 2018) (holding the work-product doctrine shields discovery of 3PCL financing).

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 2127807

---

### Footnotes

1    "Third-party litigation financing" does not include subrogation interests, such as the rights of medical insurers to recover from a successful personal-injury plaintiff.

---

1993 WL 37445
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.

Eleanor T. JOHNSON, *et al.,* Plaintiffs,
v.
WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Defendant.

Civ. A. No. 86–3110–LFO.
|
Feb. 3, 1993.

MEMORANDUM AND ORDER

OBERDORFER, Senior District Judge.

**\*1** On January 22, 1993, a hearing was held on defendant's Motion to Quash Plaintiffs' Notice of Videotape Deposition of Jo Ann Funderburk or in the Alternative to Temporarily Stay Said Deposition, and the deposition was stayed pending further order of this Court. On February 2, 1993, a further hearing was held on defendant's motion. Appearing on behalf of Ms. Funderburk was Cathy Jo Burdette, of the law firm Miller, Cassidy, Larroca & Lewin, who was appointed by the Court on January 22, 1993.

This case involves the death of Devorah Johnson, who committed suicide by jumping onto the defendant's subway track at the Metro Center station. Plaintiffs are Devorah Johnson's parents. They argue that defendant is liable for the death because the train operator had the last clear chance to avoid it. A jury trial in December 1992 resulted in a mistrial. Much of the evidence at trial consisted of eyewitness accounts regarding the timing and location of the train in relation to Devorah Johnson's placement on the track. One of the eyewitnesses who testified at trial was Jo Ann Funderburk. As was plain during her trial testimony, Ms. Funderburk's medical condition is serious. She has several forms of cancer including brain cancer, and suffers from a severe respiratory ailment. She came to Court accompanied by a nurse and used a walker and a respirator. The questioning of Ms. Funderburk was plainly difficult and upsetting for her. At one point she broke down on the stand, requiring that a brief recess be called. Nevertheless, Ms. Funderburk's testimony was completed during the trial.

On January 15, 1993, after the mistrial had been declared, plaintiffs served defendant with a "Notice of Videotape Deposition of Jo Ann Funderburk." The deposition was scheduled for January 27, 1993. Defendant then filed the instant Motion to Quash.

As explained from the bench, the proposed deposition of Ms. Funderburk is not warranted. First, Ms. Funderburk's physical and mental condition is grave. It was apparent to anyone who observed her trial testimony that the experience of testifying was painful and grueling to her. Counsel appointed by the Court for Ms. Funderburk also represented that she had spoken with Ms. Funderburk's physician, Dr. Kossaf of the District of Columbia General Hospital. Although Ms. Funderburk has expressed her willingness to testify if required to do so, it was Dr. Kossaf's medical view that Ms. Funderburk should not undergo the strain of being deposed again. Exposing a dying woman to such discomfort a second time is not justified by the incremental value of a videotaped record of her testimony, given that there already exists a transcribed record of her complete trial testimony.

Second, the proposed deposition fails to satisfy the traditional standard for conducting a *de bene esse* deposition. In its Motion to Quash, defendant initially argued that discovery in this case had long since closed. In response, plaintiffs stated that the proposed deposition was a *de bene esse* deposition and that such depositions routinely take place after the close of discovery. The rationale for a *de bene esse* deposition, however, is generally to preserve testimony in danger of being lost. *See, e.g., Quality Inns Int'l. Inc. v. Patel,* 1988 WL 137782, \*1–2, 1988 U.S. Dist. LEXIS 14342, \*3 (D.Md.1988); *Westmoreland v. CBS, Inc.,* 584 F.Supp. 1206, 1211–13 (D.D.C.1984), *aff'd in relevant part,* 770 F.2d 1168 (D.C.Cir.1985); *In re China Merchants Steam Navigation Co.,* 259 F.Supp. 75, 77 (S.D.N.Y.1966); *Shellabarger v. Oliver,* 64 F. 306, 308 (Cir.Ct.Kan.1894); *People v. Municipal Court for Pasadena Judicial Dist.,* 20 Cal.3d 523, 542, 574 P.2d 425, 436 (1978); 1 Bouvier's Law Dictionary 759. There is no such danger here. Ms. Funderburk's testimony has been taken, and there is little doubt that it will be admitted at the second trial. What plaintiffs seek is simply a videotaped version of that testimony. The purpose of a *de bene esse* deposition is not to provide a visual aid. Even if the rationale behind such depositions did include preserving testimony in a form closer to "live" testimony, the deposition would not be justified under the circumstances here, for the reasons stated above.

Case 4:17-cv-13292-LVP-EAS ECF No. 122-13 filed 02/27/20 PageID.2944 Page 6 of 16

Johnson v. Washington Metropolitan Area Transit Authority, Not Reported in F.Supp....

**\*2** Accordingly, it is this 3rd day of February, 1993, hereby

ORDERED: that defendant's Motion to Quash should be, and is hereby, GRANTED; and it is further

ORDERED: that the deposition of Jo Ann Funderburk shall not be taken.

**All Citations**

Not Reported in F.Supp., 1993 WL 37445

---

**End of Document**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 5730101
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

David E. KAPLAN, Roxy D. Sullivan, Lindsey Rankin, Michael S. Allen, Gary W. Muensterman, and Chi–Pin HSU Individually and on Behalf of All Others Similarly Situated, Plaintiffs,
v.
S.A.C. CAPITAL ADVISORS, L.P., S.A.C. Capital Advisors, Inc., CR Intrinsic Investors, LLC, CR Intrinsic Investments, LLC, S.A.C. Capital Advisors, LLC, S.A.C. Capital Associates, LLC, S.A.C. International Equities, LLC, S.A.C. Select Fund, LLC, Steven A. Cohen, Mathew Martoma, and Sidney Gilman, Defendants.

No. 12–CV–9350 (VM)(KNF).
|
Signed Sept. 10, 2015.

**MEMORANDUM and ORDER**

KEVIN NATHANIEL FOX, United States Magistrate Judge.

 \*1  By a letter motion, the plaintiffs requested that the Court compel defendant S.A.C. Capital Advisors, L.P. and its affiliates (collectively "S.A.C." or "S.A.C. defendants") to produce, *inter alia,* documents concerning the indemnification of individual defendant Mathew Martoma ("Martoma") by the S.A.C. defendants in connection with this action. Martoma opposed the plaintiffs' motion.

Also by a letter motion, the defendants requested that the Court compel the Elan shareholder plaintiffs to produce "contracts, litigation funding agreements, other similar documents executed between their counsel and third parties relating to this case, and correspondence with those funders or third parties about this case (the 'Litigation Funding ocuments')." The plaintiffs opposed the motion.[1]

By an order dated June 26, 2015, the undersigned, having considered all the submissions made in connection with the parties' respective motions: (1) granted the plaintiffs' request for documents concerning the indemnification of Martoma by the S.A.C. defendants; and (2) denied the defendants' request for the Elan shareholder plaintiffs' Litigation Funding Documents. Thereafter, Judge Victor Marrero remanded the matter "for the purpose of a statement of the reasoning and findings supporting such Order." Accordingly, the June 26, 2015 order is vacated and the Court sets forth its reasoning and findings in the instant Memorandum and Order.

*A. Plaintiffs' Demand for Martoma's Indemnification Documents*

The plaintiffs seek, *inter alia,* "[a]ll documents concerning [S.A.C.] indemnifying, or potentially indemnifying, Martoma for all or any portion of the costs and expenses he had incurred or would incur in connection with any investigation, enforcement action or prosecution by the United States Securities and Exchange Commission, the United States Department of Justice, or any other governmental agency."

The plaintiffs contend that documents concerning S.A.C.'s indemnification of Martoma should be produced because they are relevant to the claims and defenses at issue in this action in that they may show Martoma's "credibility, motive and bias." They also assert that such documents are not privileged.

In opposing the plaintiffs' motion, Martoma contends that the plaintiffs "do not and cannot argue that Indemnification Documents (if any) would have any connection to their claims or to Martoma's ... defenses" and, "[a]t most, [his] credibility or bias would be relevant to impeach his testimony." However, Martoma "does not expect to testify but rather to assert his Fifth Amendment privilege ." In addition, according to Martoma, even if the Court were to find that the indemnification documents were relevant to the plaintiffs' claims, it "should still deny Plaintiffs' motion to compel because Plaintiffs already have extensive discovery of the relationship between [S.A.C.] and ... Martoma." Therefore, the production of any indemnification agreements would add nothing to the plaintiffs' efforts to show credibility, motive, or bias. Martoma also argues that indemnification documents, if any, "would be work product and privileged communications" and would fall under the common interest privilege. Consequently, he contends, such documents are not discoverable.

 \*2  In response, the plaintiffs argue that, since Martoma's employment with S.A.C. ended in 2010, "production of indemnification documents is necessary to reveal the Defendants' current relationship, if any, as it relates to the claims at issue in this litigation-specifically, whether ...

Martoma is relying on [S.A.C.] for payment of his defense costs, and whether [S.A.C.] would be liable for any judgment obtained against ... Martoma." The plaintiffs also contend that Martoma's "right to assert a privilege against self-incrimination will likely expire when his appeal is completed."

The scope of discovery in a federal action is broad providing that, unless otherwise limited by court order, a party may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. See Fed.R.Civ.P. 26(b)(1). At the pretrial discovery stage of a litigation, relevancy, as it relates to information sought to be disclosed, is broadly construed and incorporates information which is not admissible at trial if the discovery sought appears reasonably calculated to lead to the discovery of admissible evidence. See Fed.R.Civ.P. 26(b)(1).

Courts have found that indemnification agreements between co-defendants, including agreements regarding the payment of defense fees and costs, are relevant to credibility issues and a proper subject of discovery. See Concepcion v. The City of New York, No. 05 CV 8501, 2006 WL 2254987, at *4 (S.D.N.Y. Aug. 4, 2006) ["The plaintiff] is entitled to explore the potential bias or prejudice of adverse parties [and] [a]n indemnification agreement between co-defendants may lead to evidence of such bias."); Brocklesby v. United States, 767 F.2d 1288, 1292–1293 (9th Cir.1985) (finding that indemnification agreement between co-defendants was admissible to show whether their relationship was adverse and to attack the credibility of their witnesses); Powerlift Inc. v. Mark Indus., Inc., No. 86 CV 2055, 1987 WL 12177, at *1 (N.D. Ill. June 9, 1987) (existence of indemnification agreement may reveal bias or prejudice respecting, *inter alia*, whether defendant may be seen to induce co-defendant to cooperate in defense); United States v. Cathcart, No. C 07–4762, 2009 WL 1764642, at *2 (N.D. Cal. June 18, 2009) (discovery into source of payment of defendant's legal fees relevant to issue of credibility and bias); cf. In re Lloyd's Am. Trust Fund Litig., No. 96 CIV. 1262, 1998 WL 50211, at *20 (S.D.N.Y. Feb. 6, 1998) (denying motion to compel where disclosure of fee arrangement would be cumulative and details of such agreement would add nothing to argument of potential bias); Trident Steel Corp. v. Reitz, No. 04:11 CV 1040, 2012 WL 6216799, at *1–2, (E.D.Mo. Dec. 13, 2012) (denying motion to compel, production of indemnification agreement between defendant and third party).

Further, contrary to Martoma's contention, courts have found that fee payment agreements that may be relevant to credibility and bias are not privileged. *See, e.g.,* Cathcart 2009 WL 1764642, at *2. Additionally, with respect to Martoma's position that he will assert his Fifth Amendment privilege against self-incrimination if he is called to testify while his criminal case is on appeal, the Court notes that S.A.C. is a party to any indemnification agreement with Martoma and can testify independently of him about such an agreement. For these reasons, the plaintiffs' motion to compel the defendants to produce any indemnification documents between Martoma and S.A.C. is granted.

### B. Defendants' Demand for Plaintiffs' Litigation Funding Documents

**\*3** The defendants have asked the Court to compel the Elan shareholder plaintiffs to produce the set of documents, including litigation funding agreements, which they have designated Litigation Funding Documents. The defendants assert that "[c]ounsel to lead plaintiffs for the Elan shareholder class admit that they are funding this case through a litigation funding agreement with a third party, but have refused to provide any details or documents concerning that arrangement." In asserting their entitlement to discovery of the Litigation Funding Documents, the defendants assert that they should be allowed "to explore whether there may be a risk that the Elan plaintiffs' funding arrangements could affect the strategic decisions they will make on behalf of the class, or could cause counsel's interest to differ from those of the putative class members they purport to represent." Similarly, the defendants argue that, without the discovery they seek, the putative class members may "only later learn, possibly years in the future, that the funding arrangement raises issues with the Elan plaintiffs' resources or adequacy ... [and] that could have severe consequences." In such a case, there could be "a conflict within the class, or intra-class conflicts" and, as a result, "class members could attack the result of any settlement or trial of this case." Again, if counsel were to run out of funds, the "class members may attempt to re-litigate this case all over again with a new set of lead plaintiffs."

The defendants argue further that the Court should grant their "narrow and targeted request for Litigation Funding Documents" because these documents are needed "to ensure that the Elan lead plaintiffs and their counsel can satisfy the prerequisites of [Fed.R.Civ.P.] 23." Specifically, the defendants contend, this discovery is needed so that the Court can "assess whether plaintiff's (i) possess sufficient resources

to commit to the class; (ii) will adequately represent the class; and (iii) can fund proper notice to the many thousand absent class members."

On the first point, the defendants argue that the "analysis mandated by Rule 23(g) would be impossible without appropriate information about plaintiffs' counsel's arrangements for funding the litigation."[2] The defendants suggest that, although the plaintiffs represent that their firm has sufficient resources to litigate this action, "that is only because-by their own admission-some undisclosed third party is providing funding to them specifically for this litigation." The defendants contend that they are "entitled to understand the details of the arrangements given their relevance to the upcoming Rule 23(g) inquiry."

The defendants contend further that the "Elan plaintiffs' ability to finance the prosecution of this class action is also relevant to whether or not they 'will fairly and adequately protect the interests of the class,' as required by [ Rule 23(a)(4) ]." The defendants recognize that the Elan plaintiffs' counsel, as opposed to the plaintiffs themselves, are advancing the costs of the litigation. Additionally, the defendants acknowledge that "[t]he only case cited by either party ... that bears directly on the discovery of class counsel's funding for an adequacy inquiry is *Guse v. J.C. Penney Co.,* 409 F.Supp. 28 (E.D.Wis.1976), *rev'd on other grounds,* 562 F.2d 6 (7th Cir.1977)." Notwithstanding that the case on which they rely is non-binding, the defendants contend that it considered "an almost identical request" to that made here by the defendants.

 **\*4** In *Guse,* the defendant sought information concerning the financial status of the Milwaukee Legal Services, Inc. because it had agreed to advance the money necessary for the plaintiff to pursue the case as a class action. 409 F.Supp. at 30. The court found that, with respect to the issue of whether the plaintiff was "an adequate class representative for the purposes of Rule 23(a) (4), the relevant inquiry concerning the ability to fund the costs of a class action focuses upon the assets of the plaintiff's attorneys." *Id.* Consequently, the court found that a representative of Milwaukee Legal Services, Inc. should be required to answer deposition questions regarding that entity's financial position. *Id.* at 30–31.

The plaintiffs' counsel's financial arrangements are also relevant, according to the defendants, under Rule 23(c)(2)(B), which requires class representatives to bear the costs of providing notice to class members. Noting that the costs of providing notice to class members in a nationwide securities class action can be high, the defendants assert that the plaintiffs' counsel's ability to pay for notice is relevant to whether they will fairly and adequately represent the class.

In opposing the defendants' motion, the plaintiffs contend that their "demand for discovery from counsel regarding its finances is not supported by any case in this Circuit that Defendants cite or that Plaintiffs have found." The plaintiffs argue that: (a) speculative discovery regarding counsel's adequacy is not permitted; (b) the defendants are not entitled to discovery because counsel's adequacy and financial capacity are presumed; (c) litigation funding documents are not subject to production unless a specific issue in the case makes them relevant; and (d) communications with potential litigation funders are entitled to attorney-work-product protection.

Regarding the speculative nature of the defendants' discovery demand, the plaintiffs assert that the defendants "have cited no basis for questioning counsel's financial capacity and the demand for financial disclosure is particularly inappropriate because the *Kaplan* Plaintiffs are represented by two firms with a combined total of over thirty attorneys." Moreover, they argue, the claims in this case are being jointly prosecuted with two other substantial firms representing the Wyeth investors.

On the issue of counsel's adequacy and financial capacity, the plaintiffs argue that "Rule 23(g) has never been held to call for any inquiry into class counsel's finances, absent a reason to doubt their resources." Moreover, they contend, the adequacy of counsel in this case is demonstrated by their work to date: "counsel have devoted many thousands of hours to this action, extensively developed the facts and claims, reviewed millions of pages of documents, and litigated multiple merits and discovery motions." The plaintiffs contend further that litigation funding agreements such as the defendants seek in this case have been ordered produced "only when relevant to a specific issue in controversy" and no such issue exists here. The defendants' motion should also be denied, the plaintiffs argue, because the documents they seek are entitled to attorney-work-product protection.

**\*5** As a rule, "the party seeking disclosure must make a showing of the requested information's relevance to its claims or defenses." *Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.,* No. 09 Civ. 3701, 2013 WL 1896934, at \*2 (S.D.N.Y. May 7, 2013) (citation omitted), The defendants have failed to make such a showing.

The basis for the defendants' motion to compel production of the Litigation Funding Documents is the acknowledgment by counsel to lead plaintiffs for the Elan shareholder class that funding for this case comes, in part, through a litigation funding agreement with a third party. The defendants argue that discovery of such an agreement is relevant to the issue of the fitness of counsel to represent the class. However, the defendants "have provided no nonspeculative basis for raising such concerns." *Id.* (citing *Piazza v. First American Title Ins. Co.,* No. 3: 06 CV 765, 2007 WL 4287469, at \*1 (D.Conn. Dec. 5, 2007)) (fee agreement is irrelevant to class certification when there was no basis for defendants' speculation regarding conflicts of interest). Thus, the reasons adduced by the defendants in support of their view that they are entitled to discovery of the Litigation Funding Documents-that: (a) there may be "a risk that the Elan plaintiffs' funding arrangements could affect the strategic decisions they will make on behalf of the class;" or (b) the funding arrangements "could cause counsel's interest to differ from those of the putative class members they purport to represent;" or (c) the putative class members may "only later learn, possibly years in the future, that the funding arrangement raises issues with the Elan plaintiffs' resources or adequacy;" or (d) there could be "intra-class conflicts" or "class members could attack the result of any settlement or trial of this case;" or (e) if counsel were to run out of funds, the "class members may attempt to re-litigate this case all over again with a new set of lead plaintiffs"-are purely speculative. The plaintiffs' admission that they have entered into a litigation funding agreement does not, of itself, constitute a basis for questioning counsel's ability to fund the litigation adequately.

Additionally, as the defendants acknowledge, the only case that bears directly on the issue of financial disclosure of class counsel's funding, *i.e., Guse,* is non-binding and factually distinguishable. Moreover, in light of counsel's past work on this litigation, its partnership with other law firms and its explicit representation to the Court that the law firms involved "have sufficient resources to see the case through to trial and appeal, if need be," no basis exists for concluding that counsel's financial resources are inadequate.

For these reasons, the Court finds that the defendants did not show that the requested documents are relevant to any party's claim or defense. Therefore, the defendants' motion to compel production of the plaintiffs' Litigation Funding Documents is denied. [3]

**\*6** This Order resolves the parties' respective letter motions. The Clerk of Court is directed to record as vacated the June 26, 2015 order appearing at Docket Entry No. 190.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 5730101

---

**Footnotes**

1     By an order dated May 15, 2015, the parties were directed to submit memoranda of law to the Court, with citations to binding caselaw, in support of their respective positions on this issue.

2     Federal Rule of Civil Procedure 23(g) provides, in pertinent part, that "[i]n appointing class counsel, the court ... must consider ... the resources that counsel will commit to representing the class." Fed.R.Civ.P. 23(g)(1)(A)(iv).

3     On August 17, 2015, after Judge Marrero remanded this matter for the limited purpose explained above, the S.A.C. Defendants submitted a letter to the undersigned seeking to provide new evidence which they contend "warrants reconsideration" of the June 26, 2015 order. Thereafter, on August 21, 2015, the plaintiffs submitted a response to the defendants' letter and, on August 25, 2015, the defendants submitted a reply. The matters raised in the parties' correspondence did not inform the Court's June 26, 2015 order; therefore, th.ose

matters exceed the parameters of Judge Marrero's directive, which called for "a statement of the reasoning and findings supporting" the June 26, 2015 order. Consequently, the Court has not considered the parties' recent correspondence in preparing the instant Memorandum and Order.

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 870443
Only the Westlaw citation is currently available.
United States District Court, W.D. Kentucky, at Louisville.

LONG JOHN SILVER'S INC. and
A & W Restaurants, Inc., Plaintiffs
v.
Patrick NICKLESON, et al., Defendants.

Civil Action No. 3:11–CV–93–H.
|
March 7, 2013.

**Attorneys and Law Firms**

Margaret R. Grant, Stites & Harbison, PLLC, Louisville, KY, for Plaintiffs.

Stuart E. Alexander, III, Tilford, Dobbins, Alexander, PLLC, Louisville, KY, J. Michael Dady, John D. Holland, Dady & Gardner PA, Minneapolis, MN, for Defendants.

**MEMORANDUM OPINION AND ORDER**

JOHN G. HEYBURN II, District Judge.

**\*1** Before the Court is Plaintiff A & W Restaurants, Inc.'s ("A & W") motion for a protective order pursuant to Federal Rule of Civil Procedure 26(c)(1)(G) to forbid Defendants [1] from compelling A & W to testify on certain financial information relating to the sale of the A & W brand. This action stems from a suit involving a series of failed restaurant franchises in Minnesota. Defendants' deposition notice for an A & W corporate representative contained two topics A & W objects to: (1) the sale of A & W to A Great American Brand LLC ("AGAB"), including, but not limited to, details related to potential liabilities of A & W which accrued prior to the sale of the A & W system but were not liquidated at the time of sale, and (2) the terms of sale of the A & W franchise systems by Yum! Brands, Inc. A & W argues that the information sought is either confidential, irrelevant, or unavailable to A & W.

I.

Parties are entitled to the discovery of any "nonprivileged matter that is relevant to any party's claim or defense." FED.R.CIV.P. 26(b)(1). "Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* However, this right is not absolute. *See* FED.R.CIV.P. 26(c)(1). For example, a party is entitled to protection against discovery of any "trade secret or other confidential research, development, or commercial information." FED.R.CIV.P. 26(c)(1)(G). Once the party opposing discovery establishes that the information sought is confidential and potentially harmful if discovered, "the burden shifts to the party seeking discovery to establish that the disclosure is relevant and necessary to the action." *Evercom Sys. ., Inc. v. Combined Pub. Commc'ns, Inc.,* 2012 WL 3555314, at \*4 (W.D.Ky. Aug.16, 2012). "If proof of relevancy or need is not established or if discovery would nevertheless be unreasonable, oppressive, annoying, or embarrassing, or otherwise unduly injurious, discovery should be denied." *Id.*

A & W claims that the objectionable topics demand company financial information that is both confidential and proprietary. Additionally, A & W contends that the information is irrelevant to the remaining claims in the case. Defendants maintain that the information sought speaks to A & W's motivation for pursing this case against Defendants, and whether A & W quantified potential liability to Defendants.

Here, A & W has shown good cause why a protective order should be granted. According to its motion, Yum! Brands Inc. sold the A & W brand rights to AGAB through a confidential bidding process and subsequent confidential sale and purchase agreement. Information concerning this sale is included in Yum! Brand Inc.'s Form 10–K filing with the U.S. Securities and Exchange Commission and various Franchise Disclosure Documents. A & W contends that any additional information not found in those disclosures is confidential. This Court agrees.

**\*2** The information is highly proprietary in that it is a part of a confidential corporate transaction. Parties often bargain for confidentiality in a contract, and that confidentiality should be respected by the Court except in circumstances when the information is truly relevant and necessary to the action.

The claims remaining in the case involve Defendants' failure to comply with franchise and guaranty obligations and A & W's misrepresentation of financial projections. The terms of the sale to AGAB, which occurred years later, have no bearing

on the remaining claims. The sale did not directly, or even indirectly, implicate or affect Defendants, and is not the basis for any cause of action or defense.

Defendants maintain that the information requested is relevant because it may reveal A & W's estimation of the amount of liability it has to Defendants and other similarly situated franchisees. Defendants have not established how this information is relevant and necessary to a claim or defense. The information sought, specifically whether the AGAB deal accounted for the existence of pending liabilities, is irrelevant. The only purpose for this information that the Court can glean is that Defendants seeks some sort of admission of guilt on the part of A & W, which is speculative at best. A & W's potential liability to Defendants is within the knowledge of Defendants. Moreover, A & W's motivation for pursuing this lawsuit arises out of Defendants' alleged failure to abide by the franchising agreements; the existence of some ulterior motive is irrelevant. A & W has the right to seek termination of the franchisee agreement and damages if it finds that there were legitimate breaches of the franchise agreement. See S & R Corp. v. Jiffy Lube Intern., Inc., 968 F.2d 371, 375 (3d Cir.1992)("The franchisor has the power to terminate the relationship where the terms of the franchise agreement are violated.").

Arguably, if Defendants had shown some degree of relevancy or necessity, the Court could craft a limited protective order that would safeguard the confidential information. See Seattle Times Co. v. Rhinehart, 467 U.S. 20, 36, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984)("The unique charter of the discovery process requires that the trial court have substantial latitude to fashion protective orders."). However, Defendants have failed to show how the information sought, which is confidential and proprietary, is necessary to their case. See 8A Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 2043 (3d ed.2012)(explaining that the information sought must be shown to be relevant and necessary before a court can consider whether a limited protective order can be implemented).

Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Plaintiff A & W's motion for protective order is SUSTAINED.

Defendants have filed a motion for reconsideration and Plaintiffs have filed a motion for summary judgment. Once fully briefed, the Court will take these motions under continued submission.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 870443

---

**Footnotes**

| | |
|---|---|
| 1 | Defendants are the following: Patrick Nickleson, Patrick Nickleson Enterprises, LLC, Patricia Nickleson Enterprises, LLC, and PBJ Enterprises, LLC. |

---

2019 WL 118595
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

MLC INTELLECTUAL PROPERTY, LLC, Plaintiff,
v.
MICRON TECHNOLOGY, INC., Defendant.

Case No. 14-cv-03657-SI
|
Signed 01/07/2019

**Attorneys and Law Firms**

Fabio Elia Marino, Teri H.P. Nguyen, Rebecca Blaire Horton, Polsinelli LLP, Palo Alto, CA, Barrington E. Dyer, Polsinelli, San Francisco, CA, Laura Kieran Kieckhefer, McDermott Will & Emery, Menlo Park, CA, for Plaintiff.

Michael Richard Headley, Fish & Richardson P.C., Redwood City, CA, Adam Ryan Shartzer, Brian James Livedalen, Pro Hac Vice, Robert Andrew Schwentker, Pro Hac Vice, Robert Andrew Schwentker, Ruffin B. Cordell, Pro Hac Vice, Brian James Livedalen, Timothy Wayne Riffe, Pro Hac Vice, Fish and Richardson P.C., Matthew J. Dowd, Robert J. Scheffel, Dowd Scheffel PLLC, Washington, DC, Anthony Van Nguyen, Pro Hac Vice, Fish and Richardson, P.C., Houston, TX, Jonathan Benjamin Bright, Pro Hac Vice, Jonathan Benjamin Bright, Fish and Richardson P.C., Atlanta, GA, Michael R. Ellis, Fish and Richardson P.C. Fish and Richardson P.C., Dallas, TX, for Defendant.

### ORDER RE: DISCOVERY

Re: Dkt. Nos. 269, 262

SUSAN ILLSTON, United States District Judge

*1 The parties have submitted four discovery disputes to the Court. This order resolves two disputes and directs the parties to be prepared to discuss the other two disputes at the January 11, 2019 hearing.

### I. Ownership of the '571 patent
The first dispute concerns discovery regarding the ownership of the '571 patent. Micron contends that MLC has obstructed Micron's ability to obtain information relating to the ownership of the '571 patent, and Micron seeks an order compelling MLC to produce a corporate witness "to testify as to the ownership of the '571 patent, including the identification of all entities with an ownership interest in the '571 patent, and the terms of such interest and produce any relevant documents that have been withheld on the basis of privilege." Dkt. No. 259-4 at 3.

MLC asserts that Micron is attempting to manufacture a dispute, and that it has already provided information showing that MLC, and MLC alone, owns the '571 patent. MLC states that it has produced assignment records from the USPTO showing the chain of ownership for the '571 patent from 1997 until it was assigned from BTG International, Inc. to MLC Intellectual Property, LLC in May 2012, and that it produced the assignment agreement. *Id.* MLC also states that in response to Micron's Interrogatory No. 6 regarding MLC's bases for relief in this case, MLC stated that "MLC is the holder of all rights and interests in the '571 patent," and that MLC repeated this statement in a supplemental response to the same interrogatory. *Id.* Finally, MLC states that its corporate witness regarding the ownership of the '571 patent, Robert Hinckley, testified at his deposition that MLC, and no other entity, owned the '571 patent. MLC contends that Micron is attempting to manufacture a dispute about ownership by quoting Mr. Hinckley's deposition testimony about financial interests in the '571 patent (to which MLC's counsel objected on the basis of privilege), as opposed to ownership.

The Court finds that the supplemental discovery that Micron seeks is unnecessary, subject to the following: by **January 14, 2019,** MLC shall provide a statement (in the form of a sworn declaration or a verified supplemental interrogatory response) stating in unequivocal terms that MLC has sole ownership of the '571 patent. See *Israel Bio-Eng'g Project v. Amgen, Inc.*, 475 F.3d 1256, 1265 (Fed. Cir. 2007) (in order to have standing to allege infringement, plaintiff must have sole ownership of the patent or join all other owners). If MLC does not provide such an unequivocal statement, the Court will revisit the issue of supplemental discovery regarding ownership of the '571 patent.

### II. Financial interests in the '571 patent (litigation funding agreement)
Micron seeks discovery regarding "persons and entities that have a financial interest in this litigation," including an identification of any third party that is funding this

litigation. MLC has objected to this discovery as privileged and irrelevant.

Micron contends that this discovery is relevant "to uncover possible bias issues." Dkt. No. 259-6 at 2. Micron asserts that it "needs to understand the existence of conflicts of interest to identify and exclude jury members who may have a bias," and that "Micron should be able to explore credibility and bias issues concerning MLC's witnesses." *Id.*

**\*2** MLC responds that it has already identified all persons and entities having a financial interest in the controversy, as required by Civil Local Rule 3-15. MLC asserts that neither the federal rules nor local rules require the disclosure of litigation funding agreements except in class action suits. *See* Standing Order for All Judges of the Northern District of California, ¶ 19 ("In any proposed class, collective, or representative action, the required disclosure [of Non-party Interested Entities or Persons] includes any person or entity that is funding the prosecution of any claim or counterclaim."). MLC also argues that Micron's arguments about potential bias or conflicts of interest are unpersuasive, and MLC states that none of the non-party percipient witnesses are funding this litigation.

The Court concludes that Micron is not entitled to the discovery it seeks because it is not relevant. MLC has complied with the local rules and disclosed persons and entities with a financial interest in this case as defined by [28 U.S.C. § 455(d)(1), (3) and (4)](#). If this case proceeds to trial, the Court can question potential jurors *in camera* regarding relationships to third party funders and potential conflicts of interest. MLC has confirmed that the non-party witnesses are not funding this litigation. As such, Micron's assertions of potential bias and conflicts of interest are speculative. The cases cited by Micron do not support Micron's broad request, as the courts simply held that fee and litigation funding agreements could be discoverable when there was a specific, articulated reason to suspect bias or conflicts of interest. *See [Yousefi v. Delta Elec. Motors](#)*, No. C13-1632 RSL, 2015 WL 11217257, at \*2 (W.D. Wash. May 11, 2015) ("Whether plaintiff is funding this litigation through savings, insurance proceeds, a kickstarter campaign, or contributions from the union is not relevant to any claim or defense at issue. If, however, Local 46 has not merely donated funds or expertise to pursue these claims but has an expectation of payment if and only if plaintiff prevails, evidence of that financial interest may be relevant to determining the credibility and potential bias of Local 46 witnesses."); [*Nelson v. Millennium Labs*,](#) Case No. 2:12-cv-01301-SLG, 2013 WL 11687684, at \*5-6 (D. Ariz. May 17, 2013) (court ordered production of the plaintiff's fee agreements because the defendant asserted that a market competitor was funding the plaintiff's litigation).

### III. Communications between Messrs. Banks and Hinckley and the attorney client privilege

Micron seeks discovery of communications between MLC's CEO Jerry Banks and MLC's Chairman and counsel Robert Hinckley between January 1, 2014 and October 2, 2017. Micron contends that it is entitled to these communications because Mr. Hinckley's law license was inactive, and Mr. Hinckley testified that he did not provide legal advice during that time. MLC contends that these communications are privileged and that Mr. Hinckley did, in fact, provide legal advice.

The Court cannot resolve this issue on the present record, as neither party has provided any declarations or evidentiary support for the factual assertions made in the letter brief.[1] Accordingly, at the January 11, 2019 hearing, the parties shall be prepared to discuss what further proceedings are necessary to resolve this matter.

### IV. ITC investigation documents

Micron seeks an order compelling MLC "to have produced, or consent to the production of, any responsive non-privileged 683 Investigation documents that may contain MLC's confidential information." Dkt. No. The 683 investigation was initiated in 2009 by BTG, MLC's predecessor-in-interest to the '571 patent, and it proceeded through an evidentiary hearing and post-hearing briefing before settling in 2010. Micron states that it has subpoenaed the relevant ITC-related documents from McKool Smith, the law firm that represented MLC and BTG during the 683 Investigation, and that it has also subpoenaed the documents directly from the ITC. Micron also states that it has moved to enforce those subpoenas in the Northern District of Texas and the District of Columbia, and that it has moved to transfer those subpoena enforcement actions to this Court. Micron seeks, *inter alia*, testimony that Mr. Banks provided during the ITC Investigation through deposition, written statements, and at the evidentiary hearing. Micron states that to date it has only received a "rough" transcript of Mr. Banks' deposition.

**\*3** MLC states that it has provided all of the documents in its possession (totaling thousands of pages), and that any remaining documents can only be produced by McKool and

Case 4:17-cv-13292-LVP-EAS ECF No. 122-13 filed 02/27/20 PageID.2954 Page 16 of 16

MLC Intellectual Property, LLC v. Micron Technology, Inc., Not Reported in Fed. Supp....

the ITC. MLC asserts that the documents that remain to be produced contain third-party confidential information, and that such documents are governed by an ITC protective order.

It is the Court's view that Mr. Banks' ITC testimony is producible in this case, and that MLC should make every effort to obtain Mr. Banks' testimony and produce it. It is unclear to the Court exactly what MLC has already done in this regard, and MLC shall be prepared to address this issue at the January 11, 2019 hearing. Micron shall be prepared to discuss the status of the subpoena enforcement actions at the January 11, 2019 hearing. Finally, both parties shall be prepared to discuss, with specificity, what ITC documents MLC has already produced to Micron and what ITC documents have not been produced to Micron.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 118595

---

**Footnotes**

1 Both parties rely on *Gucci America Inc. v. Guess?*, No. 09 Civ. 4373(SAS), 2011 WL 9375 (S.D.N.Y. Jan. 3, 2011), to argue that the privilege does or does not apply here. However, the record in *Gucci* was extensive and included, *inter alia*, four briefs and ten affidavits or declarations. *Id.* at *1.

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.