# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF MICHIGAN

**AFT MICHIGAN,**

|  |  |
|---|---|
| **Plaintiff,** | **Case No. 17-cv-13292** |
| **v.** | **Honorable Linda V. Parker** |
|  | **Magistrate Judge Elizabeth A. Stafford** |

**PROJECT VERITAS, ET AL.**

## PROJECT VERITAS PARTIES' MOTION TO DISQUALIFY PLAINTIFF'S PROPOSED DAMAGES EXPERT WITNESS AND TO <u>EXCLUDE HIS OPINION AND TESTIMONY FROM TRIAL</u>

Defendants, Project Veritas and Marisa Jorge, by and through counsel, file this Motion to Disqualify Plaintiff's Proposed Damages Expert Witness and to Exclude His Opinion and Testimony from Trial.  In support of this Motion, Defendants rely upon the attached Brief in Support.

**BUTZEL LONG, P.C.**

By: /s/  Paul M. Mersino
**Butzel Long, P.C.**                                   Stephen R. Klein (P74687)
Paul M. Mersino (P72179)                       Barr & Klein PLLC
150 W. Jefferson, Suite 100                      1629 K St. NW Ste. 300
Detroit, MI 48226                                      Washington, DC 20006
mersino@butzel.com                                 steve@barrklein.com
313-225-7015                                            202-804-6676
Attorneys for Defendants

Dated:  July 15, 2020

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF MICHIGAN

AFT MICHIGAN,

|  |  |
|---|---|
| Plaintiff, | Case No. 17-cv-13292 |
| v. | Honorable Linda V. Parker |
|  | Magistrate Judge Elizabeth A. Stafford |

PROJECT VERITAS, ET AL.

**PROJECT VERITAS PARTIES' BRIEF IN SUPPORT OF THEIR
MOTION TO DISQUALIFY PLAINTIFF'S
PROPOSED DAMAGES EXPERT WITNESS AND TO
<u>EXCLUDE HIS OPINION AND TESTIMONY FROM TRIAL</u>**

## **TABLE OF CONTENTS**

INDEX OF AUTHORITIES ...................................................................... ii

ISSUE PRESENTED ............................................................................... v

MOST APPROPRIATE AND CONTROLLING AUTHORITY ...........................vi

General Background ................................................................................2

    I.  Standard of Review ..................................................................12

    II.  Paranjpe's Opinions Are Unreliable and Do Not Meet
*Daubert* Standards ........................................................................14

        a.  Paranjpe's Damages Calculation Is Not Supported by
Sufficient Facts and is Contradicted by the Facts of the
Case  ........................................................................................14

        b.  Paranjpe's Damages Calculation is Wholly
Speculative ............................................................................18

        c.  Paranjpe's Report and Testimony is Not Based on
Scientific or Specialized Knowledge or Skills that Will
Assist the Trier of Fact........................................................20

        d.  Paranjpe's Theory of Damages Cannot and Has Not
Been Tested and Has Not Been Subject to Peer Review...................21

    III.  The Alleged Damages Cannot be Recovered as a Matter of
Law  .......................................................................................23

        i.  Costs of Litigation..........................................................23

        ii.  Costs Incurred by American Federation of Teachers
(National) ..............................................................................25

CONCLUSION...........................................................................25

# INDEX OF AUTHORITIES

## Cases

*Auto Indus. Supplier ESOP v. Ford Motor Co.*,
  435 Fed. Appx. 430 (6th Cir. 2011) ....................................................................17

*Ballor v. Alcona Cnty. Rd. Comm'n*,
  1997 U.S. Dist. Lexis 4337 (E.D. Mich. 1997).....................................................6

*Bass v. Spitz*,
  522 F. Supp. 1343 (E.D. Mich. 1981) ..................................................................16

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) .................................................. i, iv, v, 12, 13, 14, 17, 18, 21

*Davis v. Landscape Forms, Inc.*,
  2015 WL 13173236 (W.D. Mich. Apr. 17, 2015)..................................................6

*Davis v. Landscape Forms, Inc.*,
  640 Fed. Appx. 445 (6th Cir. 2016) .......................................................................5

*Differential Steel Car Co. v. Macdonald*,
  180 F.2d 260 (6th Cir. 1950)................................................................................17

*Fields v. Ashford*,
  2019 WL 5704216 (E.D. Mich. Nov. 5, 2019) ............................................14, 18

*Freeport-McMoran Res. Partners v. B-B Paint Corp.*,
  56 F. Supp. 2d 823 (E.D. Mich. 1999)..................................................................23

*Hall v. IKEA Prop. Inc.*,
  2016 WL 6471406 (E.D. Mich. Nov. 2, 2016) ....................................................18

*In re Connolly N. Am., LLC*,
  398 B.R. 564 (Bankr. E.D. Mich. 2008) ..............................................................21

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ...........................................................................v, 12, 13, 16

*Marshall Lasser, P.C. v. George*,
 252 Mich. App. 104 (2002) .................................................................................19

*Morris v. Clawson Tank Co.*,
 459 Mich. 256 (1998) ........................................................................................25

*Nelson v. Tenn. Gas Pipeline Co.*,
 243 F.3d 244 (6th Cir. 2001) .............................................................................13

*Newell Rubbermaid, Inc. v. Raymond Corp.*,
 676 F.3d 521 (6th Cir. 2012) .............................................................................13

*Numatics, Inc. v. Balluf*,
 66 F. Supp. 3d 934 (E.D. Mich. 2014) ..........................................................18, 23

*Orthofix, Inc. v. Lemanski*,
 2015 WL 12990115 (E.D. Mich. Sept. 29, 2015) ..............................................17

*Ritten v. Lapeer Reg. Med. Ctr.*,
 2010 WL 374163 (E.D. Mich. Jan. 25, 2010) ......................................................6

*Saltire Indus., Inc. v. Waller, Lansden, Dortch & Davis, PPLC*,
 491 F.3d 522 (6th Cir. 2007) .............................................................................24

*Skinner v. Square D Co.*,
 445 Mich. 153 (1994) ........................................................................................24

*Smelser v. Norfolk S. Ry.*,
 105 F.3d 299 (6th Cir. 1997) .............................................................................14

*Tamraz v. Lincoln Elec. Co.*,
 620 F.3d 665 (6th Cir. 2010) .............................................................................19

*Teal v. Prasad*,
 283 Mich. App. 384, (2009) ..............................................................................24

*Waskowski v. State Farm Mut. Auto. Ins. Co.*,
 970 F.Supp.2d 714 (E.D. Mich. 2013) .................................................................6

**Rules**

Fed. R. Evid. 702 ...............................................................................12, 16

## **ISSUE PRESENTED**

Whether Plaintiff's damages expert's report and testimony should be excluded from this matter when his conclusions cannot satisfy the *Daubert* standards, are not reliable, are not supported by sufficient facts, are contradicted by the facts in the case, are wholly speculative, are not based on scientific or specialized knowledge or skills, cannot and have not been tested and have not been subject to peer review, and when the damages claimed cannot be recovered as a matter of law.

Defendants' Answer: **Yes**

## <u>MOST APPROPRIATE AND CONTROLLING AUTHORITY</u>

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)

This case stems from a three-month, unpaid internship.  AFT Michigan alleges that Defendant Jorge, as an undercover journalist, acquired an internship by misrepresenting her identity and then recorded conversations and copied documents at AFT Michigan.  AFT Michigan has not lost any revenue because of this, did not pay her anything or lose the benefit of any agreement, and has not lost any locals or members it represents.  Moreover, AFT Michigan staff have testified that Jorge did not keep them from doing their jobs or fulfilling their duties to AFT Michigan.

Yet AFT Michigan produced an expert report claiming not only that it was damaged, but that it has been damaged ever since, continues to be damaged, and may be damaged "ad infinitum."  This is not based on facts, testimony, or documents.  It is based on an expert's subjective belief that AFT Michigan was damaged for every second staff spent with Jorge, even while doing other work, doing things they would have done anyhow, or simply telling her "good morning" or "goodnight."  All based on a speculative calculation of "opportunity cost" assuming something else *could* have been done that *could* have benefited AFT Michigan.

Even though the internship ended in September, 2017, AFT Michigan claims its damages continued throughout 2020, and perhaps forever.  Under this theory, it should be paid damages for time spent reviewing actions from 2017, discussing them, writing press releases about it, sitting for depositions, and litigating this case.[1]

---

[1] Including time employees spent at meetings *before* Jorge applied for the internship,

1

The damages were not calculated by research, modeling, scientific formulas, or testing, or through review of evidence.  The numbers are not based on timesheets, testimony, or business records.  The expert merely asked employees to estimate how much time they spent with Jorge nearly two-and-one-half years prior, accepted those numbers without verification, applied a "value" based on the salary they received (that they would have received anyhow), inflating the numbers by adding in benefits (that they would receive anyhow), and multiplying it all.  The expert also included "costs" in his calculation that he admits AFT Michigan did not pay or incur.

Even with these unsubstantiated and speculative damages, AFT Michigan can still only attempt to allege between $30,667.38 and $71,946.28 in damages.

The damages report, attached as **Ex. 1**, is based on unsound theories, refuted legal theories, speculative assumptions, and unverified and contradicted facts. Defendants have produced a rebuttal expert report, attached as **Ex. 2**, which confirms that the damages calculations are speculative and do not follow accepted industry standards.  AFT Michigan's report and its expert's testimony should be excluded.

## General Background

Plaintiff and its agents have, throughout discovery, testified either that it has not incurred any damages or that those agents do not know of any.  For example,

---

and time of employees who never spent time with her while she was an intern, but "reviewed" materials after her internship.  Ex. 12 (Paranjpe Dep., 167:3-168:25).

Nate Walker—AFT Michigan employee who spent more time with Jorge than any other employee—testified that Jorge's presence never disrupted him, never disrupted AFT Michigan, and never stopped him from doing his work.  **Ex. 3** (Walker Dep., 100:10-22).  When asked if Jorge ever disrupted anyone else from doing work or getting work done, he answered "[n]ot that I know of."  *Id.*  Employee Taylor Monday was asked how much time was diverted from other projects and answered "I don't know."  **Ex. 4** (Monday Dep., 26:1-10).  Johnny Mickles—an employee who alleges to have spent nearly as much time with Ms. Jorge as anyone else—was asked whether he was still able to perform his job despite everything alleged against Ms. Jorge.  He answered, "No one has stopped me from performing my job . . . I have been able to perform my job, yes."  **Ex. 5** (Mickles Dep., 141:13-23).

AFT Michigan's President testified that he does not know whether AFT lost any members due to Ms. Jorge and that AFT Michigan has not lost any local unions that it represents.  **Ex. 6** (Hecker Dep., 64:21-65:9).  AFT Michigan's Controller testified that he does not know of a decrease in members or in revenue for AFT Michigan due to the Project Veritas investigation.  **Ex. 7** (Lobaito Dep., 20:3-6).

AFT Michigan's Corporate Designee could not articulate any damages.  He testified that he could not speculate as to whether it lost members and that he does not believe that it has lost any locals because of Jorge.  **Ex. 8** (AFT Michigan 30(B)(6) Dep., 92:22-25).  He testified that while he believes "there is substantial

3

staff time" spent because of Ms. Jorge's actions, "I don't have a particular number for you." *Id.* (19:17-19).  He also testified that no AFT Michigan grievances were interfered with by Jorge. *Id.* (93:20-94:6).  He was unable to provide any concrete answers as to damages, testifying instead that "it is my understanding that we'll be engaging an expert to provide a more substantive answer to that." *Id.* (102:1-18). Publicly available documents also establish that AFT Michigan's membership levels have not materially changed since the end of Jorge's internship.[2]

When asked specifically about damages, AFT Michigan's Corporate Designee testified that "it's still being computed . . . ." Ex. 8 (30(B)(6) Dep. Tran., 19:17-19).  He also testified that AFT Michigan did not begin to incur damages until *after* they discovered the investigation had taken place. *Id.* (19:21-20:3).  When asked what AFT Michigan's damages calculation was, the Corporate Designee answered that he did not know. *Id.* (102).

In its initial disclosures, AFT Michigan only indicated that "[o]n discovery of Defendant Jorge's fraud, Plaintiff had to expend substantial resources of time and effort to investigate the extent of Jorge's infiltration to learn what information had been viewed or copied . . . ." **Ex. 9** (Initial Disclosures).  That is, *after* Jorge had left

---

[2] AFT Michigan's annual report for the fiscal year ending June 30, 2017, prior to discovery of the Jorge investigation, show that AFT Michigan reported 18,426 members.  In its most recent report, AFT Michigan reported 18,479 total members, an increase since the investigation. *See* Ex. 2 (Winiarski Report at ¶42).

AFT Michigan.  It also claimed it paid a forensics expert, but we now know that AFT National did so, not AFT Michigan.  When asked to produce a calculation of damages, AFT Michigan merely answered that "[t]his process is ongoing and not completed."  **Ex. 10 (**AFT Michigan Response to RFP 22).  When asked to identify how it was damaged, its response only focused on post-investigation actions to "determine the extent" of Jorge's actions, claiming "[s]taff time was diverted from other projects."  **Ex. 11 (**AFT Michigan Responses to Interrogatories 7-13).

At no point through pleading, initial disclosures, or discovery did AFT Michigan produce any evidence of any actual damages.

### **Plaintiff Retains Dr. Paranjpe**

AFT Michigan retained as its Damages Expert Dr. Nitin Paranjpe.   Although he is well studied and published, he testified that none of his publications would have a direct bearing on his analysis for this case.  *Id.* (18:7-20:25).[3]

Paranjpe has been excluded as an expert witness in numerous cases.  The Sixth Circuit has upheld the exclusion of his reports as inadmissible because his findings had little probative value.  *Davis v. Landscape Forms, Inc.*, 640 Fed. Appx. 445 (6th Cir. 2016).  The lower court in that case excluded his report because it "suffer[ed]

---

[3] Dr. Paranjpe does not remember whether he has ever calculated damages in a breach of duty of loyalty claim, a fraudulent misrepresentation claim, or trespass claim and has never calculated damages stemming from a wiretapping or eavesdropping claim.  Ex. 12 (Paranjpe Dep. 22:1-25).

from significant analytical defects" and was "inadmissible and unpersuasive." *Davis v. Landscape Forms, Inc.*, 2015 WL 13173236 (W.D. Mich. Apr. 17, 2015).  This Court has also excluded him as an expert because, in part, his conclusion "lacked background data and explanations [] and suffered from other analytical defects." *Ballor v. Alcona Cnty. Rd. Comm'n*, 1997 U.S. Dist. Lexis 4337 (E.D. Mich. 1997).

In yet another case, this Court excluded Dr. Paranjpe, holding that "it is clear that Dr. Paranjpe's proposed expert report is not based on sufficient facts or data." *Waskowski v. State Farm Mut. Auto. Ins. Co.*, 970 F.Supp.2d 714 (E.D. Mich. 2013). The Court agreed that his report in that case contained "unreliable opinions . . . based almost exclusively on factual assumptions provided by Plaintiff's counsel that are unsupported, and frequently contradicted, by the actual facts developed in discovery." *Id.*  There, Paranjpe did not talk to relevant witnesses, review deposition transcripts, or review relevant data, but instead "assumed" facts based on representations from Plaintiff's counsel.  This Court excluded his report and trial testimony because it agreed that "lacking actual facts necessary to conduct his analysis . . ., Dr. Paranjpe instead resorted to assumptions, estimates, and representations from Plaintiff's counsel." *Id.*

In yet another case, *Ritten v. Lapeer Reg. Med. Ctr.*, 2010 WL 374163 (E.D. Mich. Jan. 25, 2010), this Court excluded Dr. Paranjpe's report because it "merely states *ipse dixit* that the harm resulting from the summary suspension was

permanent, without any efforts to consider, much less account for, any possible impact upon Plaintiff's earnings potential" if other alternatives had taken place.  *Id.*

### Dr. Paranjpe's Report in this Case

Dr. Paranjpe's report does not purport to assert any actual damages such as loss in revenue, lost income, lost members, expectation damages, or direct expenses incurred by AFT Michigan during Jorge's investigation.  Ex. 12 (Paranjpe Dep., 246:1-25).   Instead, it relies almost exclusively on the speculative theory of "opportunity costs" allegedly experienced by AFT Michigan with these activities. His report purports to measure AFT Michigan's alleged damages in three categories: 1) time spent by employees with Ms. Jorge during her internship; 2) time spent by employees *after* the internship "in an effort to uncover the extent of the infiltration," which also includes time spent on this litigation; and 3) direct expenditures "to uncover the extent of the breach."  Ex. 1 (Paranjpe Report at 2-3).

In calculating damages, Dr. Paranjpe did not perform any tests.  Ex. 12 (Paranjpe Dep, 27:1-25) ("there's nothing to test here—I was provided information by individuals who will provide their own testimony as to the time they spent. There's nothing to test.").  He did not review any underlying data such as time sheets or other documents.  *Id.* (35:1-25) (stating "there's no way of verifying that," and conceding he did not review timesheets, calendars, notes, outlook meeting notices, meeting minutes, attendance logs, emails, or anything else); (37:20-38:1) ("there's

no way to verify these numbers; there's a way to take what these individuals give at face value, as far as I'm concerned."); (39:14-25) ("I did not verify [the financial records]. There is no need to verify them. . . . I'm given a document by someone who is the controller at AFT Michigan. I don't see any need to verify it; you might, but I don't."). He did not speak to most of the AFT Michigan employees. *Id.* (110:1-25) ("I was supposed to have phone calls with everybody, but I waited and nobody called"). He did not apply the scientific method to his calculations in any way. *Id.* (39:14-25). Instead, he asked AFT Michigan employees to estimate, nearly two-and-a-half years later, how much time they spent with Jorge during her internship or reviewing things afterward. *Id.* (37:9-25) ("I asked individuals to provide their best estimate.") (204:10-24). Each employee told him their estimates and Paranjpe did not attempt to verify those estimates. *Id.* (41:21-25) ("Q. You personally don't know whether or not the number of minutes provided to you by each employee was accurate or not, is that correct? A. I don't, that's correct.")

Paranjpe then received from AFT Michigan a spreadsheet that broke down compensation and benefits paid to each employee. *Id.* (26:1-25). These figures were provided by AFT Michigan and Paranjpe did nothing to verify them. He stated that "when the controller of an organization gives me information, I sure hope it's correct," but he did not review accounting documents, financial records, payroll documents, or actual data to verify the numbers. *Id.* (42:1-25).

8

With estimated time provided by employees and the value of their compensation provided by Plaintiff, Paranjpe multiplied the amount of time by the earnings to come to a damages figure. *Id.* (28:1-23). There were no economic tests, no statistical analyses, no modeling, no complex economic or scientific knowledge, and no verification of the data. *See, e.g.*, *id.* (28:1-23) ("I'm not sure what you mean by formula, but yes, mathematically, you take the amount of time spent in minutes and multiply it by the hourly earnings per minute.")). Paranjpe even conceded that a layperson could complete his calculations. *Id.* (38:1-20) ("You're asking me if a lay person can do math. I'm sure there's some lay people who might be able to.").

During his deposition, Dr. Paranjpe conceded that he did not perform any tests; he did not verify the information given to him; and did not perform any research prior to producing his report. *Id.* (15:22-17:13, 27, 39).

The report includes time an employee spent saying "good morning/afternoon, goodnight" to Jorge. *Id.* (150:1-151:25).[4] It includes time an employee spent going to a conference at which he presented, simply because Jorge was also there. *Id.* (210:1-211:25). It includes time an AFT Michigan employee spent with her *prior to* her internship. *Id.* (213:21-218:5). It includes time employees spent emailing her after they knew her true identity. *Id.* (176:1-25). It includes time in depositions and

---

[4] "The time she spent saying good morning, hello, is valuable and the value of that time is what I had mentioned." Ex. 12 (Paranjpe Dep., 151).

hearings, drafting press releases about this matter, and helping Dr. Paranjpe prepare his report. *Id.* (71:1-21, 114:1-25, 212:1-16, 184:19-185:25, 195:1-196:22).

Although the internship ended in September 2017, the report includes time spent by employees in 2018, 2019, and 2020. Ex. 1 (Paranjpe Report). Dr. Paranjpe believes that this is proper if the time spent can in any way be linked to Jorge's time at AFT Michigan, even though it was years later. In fact, he testified that he believes that the damages can continue to incur "ad infinitum," so long as there is any link to Jorge's time at AFT Michigan. Ex. 12 (Paranjpe Dep., 103:12-19).[5]

When asked whether he knew what employees would have done for AFT Michigan had Jorge not been there, Paranjpe testified that it was irrelevant to him ("I don't need to know that"); so long as they spent a minute with Jorge, he asserts that AFT Michigan should be compensated for that time. *Id.* (33:6-11). In fact, he did not even ask employees whether they were unable to perform their duties because of Jorge. *Id.* He also conceded that he did not know if the amount of time employees spent with her was reasonable. *Id.* (184:5-10). He did not even attempt to determine if AFT Michigan was *actually* damaged; he relied solely on his assumptions.

Paranjpe concedes that if employees inflated their estimates, then his damages would be inflated. *Id.* (39:25-41:8). He concedes that if the compensation and

---

[5] Even if an employee keeps reviewing the same document over and over, Plaintiff should be compensated for that time. Ex. 12 (Paranjpe Dep., 65:1-66:4; 67:1-25).

benefit figures provided to him were inaccurate, then his report would be inaccurate. *Id.* But he did not verify the numbers provided to him.

Paranjpe's report also includes "direct expenditures" allegedly incurred due to Jorge's actions. These costs post-date her departure from AFT Michigan, many the filing of this suit. But the expenditures were not even costs incurred by AFT Michigan. *Id.* (53:1-25); **Ex. 13** (Invoices to AFT National). Dr. Paranjpe knows that this cost was not charged to AFT Michigan, but included it anyhow. Ex. 12 (Paranjpe Dep., 238). Paranjpe admits that he has no evidence that AFT Michigan paid this or will ever have to pay it. *Id.* (54:1-55:17). Yet he included them anyhow.

Parnajpe's report fails to address AFT Michigan's duty to mitigate. When its Corporate Designee was asked whether much of its alleged damages could have been avoided by simply not bringing this suit, he answered "that's a way to look at it." Ex. 8 (30(b)(6) Dep., 131:5-11). Paranjpe, however, was not willing to even consider this. When asked about litigation costs; time spent at hearings; or time spent drafting press releases about the suit, he merely said that because that time was spent, he included it. He did nothing to analyze whether AFT Michigan could have mitigated its alleged damages. Ex. 12 (Paranjpe Dep., 68:1-25).

Paranjpe took numbers provided to him by Plaintiff, added them and multiplied them, and put them in his report without scientific analysis or factual verification. As with other cases in which he has been excluded as an expert,

Paranjpe's report lacks background data; suffers from analytical defects; is not based on facts or data; is contradicted by the evidence; and is based on assumptions, estimates, and speculation. His report and any further testimony should be excluded.

## I.  Standard of Review

Federal Rule of Evidence 702, governing expert testimony, provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." *See also Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (extending *Daubert*'s "basic gatekeeping obligation" to all expert testimony).

Excluding improper experts is important because "[u]nlike an ordinary witness . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592. "[T]his relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id*.

"The trial court must determine . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* "This entails a preliminary assessment of whether the

reason or methodology properly can be applied to the facts in issue." *Id.*  This also applies to "technical" or "specialized" knowledge.  *Kumho Tire*, 526 U.S. at 147.

"[T]he word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.  "[I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived from the scientific method." *Id.*  This "establishes a standard of evidentiary reliability." *Id.*

The Supreme Court set forth a non-exclusive checklist to determine if there is a sufficient basis for proposed expert opinions: (1) whether the theory or technique in question "can be (and has been) tested," (2) whether it "has been subjected to peer review and publication," (3) whether it has a "known or potential rate of error," and (4) whether the theory or technique enjoys "general acceptance" in the "relevant scientific community." *Id*. at 593-94.  "Red flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012).

The proffering party has the burden to demonstrate **by a preponderance** of proof that its expert opinions are admissible. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).  "The party seeking to have testimony admitted bears the burden of showing that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology; the

expert's bald assurance of validity is not enough."  *Smelser v. Norfolk S. Ry.*, 105 F.3d 299, 303 (6th Cir. 1997); *Fields v. Ashford*, 2019 WL 5704216 (E.D. Mich. Nov. 5, 2019).  AFT Michigan cannot meet its burden.

## II. Paranjpe's Opinions Are Unreliable and Do Not Meet *Daubert* Standards

### a. Paranjpe's Damages Calculation Is Not Supported by Sufficient Facts and is Contradicted by the Facts of the Case

Dr. Paranjpe's report is not supported by sufficient facts and is in fact contradicted by the actual facts in this case.  Nor did he substantiate his report with any facts or evidence.  He simply alleges that any time—even saying hello or goodbye—spent with Jorge was an opportunity cost to AFT Michigan and that it should be compensated for that time.

Paranjpe did not analyze whether there actually *was* an opportunity cost.  He does not know what employees were working on, whether they were unable to work on other things, or whether they would have brought value to AFT Michigan had they not interacted with Jorge.  When asked whether he knew if time employees spent with Jorge would have been otherwise spent providing value, Paranjpe admitted "we don't know what they would have done, but certainly what opportunity cost is what could they have done, and they could have done any number of things." Ex. 12 (Paranjpe Dep., 235:18-236:1); (33:6-11) ("I don't need to know that.  They could have done anything else.") (87:23-25).  Nor did it matter to him if time spent with Jorge was on breaks, during lunch, after business hours, on weekends, at night,

or otherwise.  *Id.* (81:1-84:25) ("I don't care when you spend that time—whether it's on weekends, weekdays, midnights, doesn't really matter").  He took *any* time spent with Ms. Jorge, put a dollar figure on it and included it in his calculation.

But AFT Michigan employees contradict the very basis for this report.  Nate Walker, Johnny Mickles, and Taylor Monday—employees who spent the most time with Jorge—all said that they were never stopped from doing work because of Jorge and were able to complete their work for Plaintiff.  Ex. 3 (Walker Dep., 100:10-22); Ex. 4 (Monday Dep., 26:1-10); Ex. 5 (Mickles Dep., 141:13-23) ("No one has stopped me from performing my job . . . I have been able to perform my job, yes.").

Paranjpe's understanding of what data is available to him is also contradicted by AFT Michigan.  Paranjpe continually stated that there were no timesheets or other evidence he could have reviewed and therefore he simply had to rely on employees' estimates.  Ex. 12 (Paranjpe Dep., 35:1-25).  But AFT Michigan's Corporate Designee testified that employees do keep time sheets, which are kept onsite by AFT Michigan.  Ex. 8 (AFT Michigan 30(b)(6) Dep., 135:24-136:2).  Its controller also testified that employees keep timesheets.  Ex. 7 (Lobaito Dep., 10:17-20).

Dr. Paranjpe did not review any deposition transcripts. Ex. 12 (Paranjpe Dep., 58:18-59:4).  He did not review any hearing transcripts.  *Id.*  He did not review any time sheets.  *Id.*  He did not review any documents produced in this case from any party.  *Id.* at 59.  He did not review any video or audio recordings from this case.  *Id.*

He did not review any annual reports, IRS filings, balance sheets, income statements, or profit and loss statements for AFT Michigan.  *Id.*  He did not review any revenue reports or profitability analyses.  *Id.* at 60.  He did not analyze AFT Michigan's membership levels or revenue numbers.  *Id.* at 60:25-62:2.  His report is based on incomplete and unverified facts and data, or is contradicted by the facts and data.

The fact that Dr. Paranjpe's report is not based on actual facts or evidence is disqualifying.  Instead of verifying whether AFT Michigan was *actually* damaged, he simply assumes they *must have* been without verification or substantiation.  He begins his analysis where he wishes to end it.  This Court has held that experts have "no special expertise to testify that plaintiff suffered particular types of damage," or that "damages were proximately caused" by the alleged cause.  *Bass v. Spitz*, 522 F. Supp. 1343, 1352 (E.D. Mich. 1981).   While experts often rely on factual assumptions, there still must be evidence to support the assumptions.  *Id*. at 1353.

"[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination."  *Kumho Tire*, 526 U.S. at 142.  A critical aspect of reliability is the sufficiency or integrity of the facts or data that support the expert's opinion.  *See* Fed. R. Evid. 702(b).  Dr. Paranjpe's report, therefore, is unreliable.

Courts also exclude expert opinions when they are based on nothing but information provided to them by the party who retained him.  In *Orthofix, Inc. v.*

16

*Lemanski*, this Court held: "[i]t is undisputed that [the expert] did not review any hard data . . . ." 2015 WL 12990115 at \*3 (E.D. Mich. Sept. 29, 2015). Instead, his opinion was simply based on his review of materials provided to him by counsel. *Id.* The expert neither prepared the data nor reviewed underlying documents. This Court held that due to the lack of inquiry by the expert, his "report and testimony fails the reliability test of Rule 702 and *Daubert*," and "they must be excluded." *Id.*

In *Auto Indus. Supplier ESOP v. Ford Motor Co.*, 435 Fed. Appx. 430 (6th Cir. 2011), the expert relied on data compilations and summaries prepared by someone else, but did not examine any of the underlying documentation. The expert claimed the summaries "were prepared in the ordinary course of business," and that review of voluminous documents "was not necessary or appropriate." *Id.* at 454. Rejecting this, the Court held that "because [he] had no familiarity with the underlying source documents, he was not qualified to testify as an expert under Rule 702, because his expert opinion was not based on 'sufficient facts and data." *Id.*

"Where physical facts contradict expert opinions, the facts must govern. Testimony of an expert cannot prevail over such physical facts; and neither court nor jury is permitted to credit testimony so contradicted." *Differential Steel Car Co. v. Macdonald*, 180 F.2d 260, 268 (6th Cir. 1950). Thus,

> the weight of the opinion of an expert depends largely upon the facts upon which it is based. If supported by the evidence and by reason and common sense, it may carry great weight. If not justified by the evidence or by reason, it is entitled to no weight. Within reasonable limits, the weight of

expert opinion is for the jury; but, if opposed to undisputed facts, common knowledge, and reason, it will not support a verdict.

*Id*. at 269.  The proponent of an expert opinion "bears the burden of showing, among other things, that [the expert's] opinion is based on a reliable foundation." *Fields v. Ashford*, 2019 WL 5704216 (E.D. Mich. Nov. 5, 2019).

"[A]nother aspect of relevancy . . . is whether expert testimony proffered in the case is sufficiently tied to the facts of the case . . . ." *Daubert*, 509 U.S. at 591. If an expert fails to tie his opinion to the facts of the case, "the testimony must be excluded." *Numatics, Inc. v. Balluf*, 66 F. Supp. 3d 934, 959 (E.D. Mich. 2014). Nothing requires a court "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.*  "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

Paranjpe's Report is not substantiated by data, facts, or evidence.  He willfully disregards evidence of the employees whose alleged "lost time" he is calculating, and states, *ipse dixit*, that there must have been damages incurred.  But more is needed.  His report is not based on sufficient facts and should be excluded.

### b.  Paranjpe's Damages Calculation is Wholly Speculative

"Recovery is not permitted in a tort action for remote, contingent, or speculative damages." *Hall v. IKEA Prop. Inc.*, 2016 WL 6471406 (E.D. Mich. Nov. 2, 2016).  "The party asserting damages has the burden of proving its damages with reasonable certainty."  *Id.*  While Rule 702 does not require "absolute

certainty," still, "there is a line." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671-72 (6th Cir. 2010).  When opinions turn on "speculation, not a valid methodology" and are not based on any "non-speculative evidence," that line is crossed. *Id.* at 674.

Dr. Paranjpe repeatedly stated that he is relying on "estimates."  Ex. 12 (Paranjpe Dep., 37:1-25; 63:7-25; 161:1-25; 229:4-25).  But as noted, estimates are not reliable if they are not based on actual facts and evidence.  That is particularly so with the question of "opportunity costs," which are inherently and by definition speculative, and specifically in this case have not been fleshed out by actual facts.

In *Marshall Lasser, P.C. v. George*, 252 Mich. App. 104, 111 (2002), the Michigan Court of Appeals denied lost opportunity damages as speculative.  There, an employer sought damages for what it alleged it could have made had the tortious allegations not occurred.  On appeal, the court summarily held that the employer's claim of lost opportunity costs was speculative. The plaintiff's expert testified to calculations that were "entirely based on an unproven amount of lost revenue." *Id*.

Here, we have a speculative theory built upon speculative data.  Employees were asked to "estimate" how much time they spent with Jorge years prior.  But employees testified that they would not be able to reasonably do so.  Julie Rowe, for example, testified that she could not remember how much time she spent with Jorge, and that trying to do so would be "speculation." **Ex. 14** (Rowe Dep., 53:1-9).  Taylor Monday was asked how much of her time was diverted from other projects and she

answered "I don't know."  Ex. 4 (Monday Dep., 26:1-10).  When asked if she had

evidence of hours diverted from other work she said it was "doubtful."  *Id.*

Paranjpe admitted that to determine what an employee may have done had

they not spent time with Jorge would be speculation.  Ex. 12 (Paranjpe Dep., 96:1-

25).  When asked whether employees would have spent that time working for AFT

Michigan, Paranjpe testified: "Nobody knows the answer to that."  *Id.* (87:23-25).

For one employee, he took an average of time the employee said he may have spent

with Jorge, but conceded that it "would be speculative" to say how much time was

attributable to certain actions.  *Id.* (221:1-25).

Dr. Paranjpe's report is wholly speculative.  It should be excluded.

### c. Paranjpe's Report and Testimony is Not Based on Scientific or Specialized Knowledge or Skills that Will Assist the Trier of Fact

Dr. Paranjpe did not conduct any tests.  He concedes that he merely took the

numbers given to him by AFT Michigan and multiplied them.[6]  But simply taking

numbers provided by Plaintiff and adding them up or multiplying them is not based

on a scientific or specialized knowledge that would assist the jury.

It is not enough for an expert to merely take numbers provided to him and add

them up, merely acting as a human calculator in doing so.  And if that is all an expert

did, then it is not likely their testimony will help the trier of fact.  In *In re Connolly*

---

[6] With regard to the direct expenditures, Paranjpe testified that he simply "[t]ook the invoices and added them up."  Ex. 12 (Paranjpe Dep., 73:1-6).

*N. Am., LLC*, the Eastern District of Michigan Bankruptcy Court analyzed a similar situation. 398 B.R. 564, 575-76 (Bankr. E.D. Mich. 2008). The Court held that an expert's testimony of simple calculations was not admissible.

> If the [party] had established the underlying numerical facts . . . the [party] could have presented the mathematical calculations without . . . any other 'expert' witness, by putting the calculations on a blackboard or a piece of paper or in a brief, and the Court could have performed those same calculations to verify the result[] . . . . [The expert's] expertise and knowledge . . . was not needed at all to do these calculations. Any reasonably (or even minimally) educated lay person could do them.

*Id.* at 575. Because the court held that "simple addition and division does not qualify as 'scientific, technical, or other specialized knowledge,'" the expert's opinions "were not admissible under Evidence Rule 702 as expert opinion testimony." *Id.*

Here, Dr. Paranjpe concedes that he merely multiplied numbers given to him. He concedes that a layperson could do the same thing. Ex. 12 (Paranjpe Dep, 38:1-20). But because he did not verify any of the data and he did not analyze it or apply any scientific or skills to the data, his report is inadmissible.

### d. Paranjpe's Theory of Damages Cannot and Has Not Been Tested and Has Not Been Subject to Peer Review

The first *Daubert* factor is whether the expert opinion or theory can or has been tested. "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified." *Daubert*, 509 U.S. at 593. Paranjpe's report does not meet this standard. "Another pertinent consideration is whether the theory or technique has been subjected to peer review and publication." *Id.* at 593.

"[S]ubmission to scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected." *Id.* "The fact of publication (or lack thereof) in a peer reviewed journal will be relevant . . . ." *Id.*

Dr. Paranjpe did not conduct any tests or construct any models to test his theories. He did not take any steps to verify the facts upon which he relied. Nor did he question any witnesses or review any testimony as to whether or not they actually suffered any "opportunity cost." Instead, he merely took the numbers provided to him, added them up to the highest number he could, and presented them as damages.

With regard to damages for litigation costs, Paranjpe does not know of any literature that would support his damages theory. Ex. 12 (Paranjpe Dep. 163:23-164:25). He does not know of any other case in which a party was able to recover the value of time spent on litigation that that party initiated. *Id.* (163:1-164:25). In fact, he does not know of any other case in which he was an expert where litigation time spent after the alleged tortious activity has been recovered as damages. *Id.* While Dr. Paranjpe has published both refereed and non-refereed publications, none of those publications were relevant to his theories in this report. *Id.* (17:14-21:4).

Courts are required to "inquire into whether" expert testimony "reflects valid scientific knowledge and whether the proffered expert testimony is relevant to the case at hand." *Freeport-McMoran Res. Partners v. B-B Paint Corp.*, 56 F. Supp. 2d

823, 833 (E.D. Mich. 1999).  Where a "proposed expert's testimony does not reflect a 'theory or technique' that can and has been tested," and he "can point to no peer reviewed standards for the work he performed," his report or testimony should be excluded.  *Id.*  This is so "most importantly" where an expert "has not demonstrated that [his] theory or technique enjoys 'general acceptance' within a 'relevant scientific community.'" *Id.*

Dr. Paranjpe's theories have not been tested or proven.  Nor have they been subject to peer review.  And his theories and techniques are ***not*** generally accepted in the economics damages community.  Ex. 2 (Winiarski Report at ¶ 30).  In fact, this is the first case Paranjpe himself knows of to employ these theories to calculate damages in a tort action.  His report and testimony should be excluded.

## III.   The Alleged Damages Cannot be Recovered as a Matter of Law

"Damages cannot stand if any part of the calculation leading to it was unsupported or contrary to law." *Numatics, supra at* 960.  Because the damages Dr. Paranjpe claims are not recoverable by law, his report should be excluded.

### i.  Costs of Litigation

The majority of damages sought are post-internship.  And most of these are nothing more than costs of litigation, including bringing the suit, sitting for depositions, watching hearings, assisting attorneys, and assisting the expert.  But such litigation costs are not recoverable as damages.

In *Saltire Indus., Inc. v. Waller, Lansden, Dortch & Davis, PPLC*, 491 F.3d 522 (6th Cir. 2007), the Sixth Circuit affirmed dismissal of plaintiffs' claim because they could not show damages—a required element. *Id*. at 530. The court noted that the plaintiffs' only alleged damages were that it "incurred more than one million dollars in attorneys' fees and other litigation costs" in a separate related suit. *Id*. The court held that "[d]amages attributable solely to the existence of litigation are clearly insufficient to sustain the necessary element of damages . . . ." *Id*. The court held that litigation costs could not be the only damages for the plaintiffs' fraud claim.

A plaintiff may not bring a lawsuit and then rely on costs and time incurred because of that suit to satisfy the element of damages. While certain statutes permit recovery of attorneys' fees, they do not permit recovery of "lost time" spent on a suit. And while certain costs may be recoverable *as costs* if a party prevails, AFT Michigan will be unable to show any authority that time spent on litigation—litigation the Plaintiff chose to bring—can be recoverable as damages.[7] At the least, filing litigation, pursuing it, and choosing to draft press releases about it are intervening causes, breaking any proximate cause requirement necessary to recover damages. *See, e.g., Teal v. Prasad*, 283 Mich. App. 384, 391 (2009); *quoting Skinner v. Square D Co.*, 445 Mich. 153, 163 (1994).

---

[7] Nor are fees, costs, or time contractually permitted in this matter.

24

Additionally, all plaintiffs have a duty to mitigate their damages. *Morris v. Clawson Tank Co.*, 459 Mich. 256, 263 (1998).  They cannot file a lawsuit and then claim any time spent—*in perpetuity*—on that litigation is recoverable as damages.

### ii. Costs Incurred by American Federation of Teachers (National)

Paranjpe includes "direct expenditures" that he admits were not expended or incurred by AFT Michigan.  Ex. 12 (Paranjpe Dep. 53:1-54:17; 238); Ex. 13; Ex. 1. There is no evidence that this cost was incurred by AFT Michigan or that AFT Michigan will have to reimburse these costs.[8]  It is axiomatic to say that a party cannot recover costs that it did not incur.

### CONCLUSION

For the foregoing reasons, AFT Michigan's damages expert's report and testimony should be excluded from this matter.

Respectfully submitted,

**BUTZEL LONG, P.C.**

By: /s/  Paul M. Mersino

| | |
|---|---|
| **Butzel Long, P.C.** | Stephen R. Klein (P74687) |
| Paul M. Mersino (P72179) | Barr & Klein PLLC |
| 150 W. Jefferson, Suite 100 | 1629 K St. NW Ste. 300 |
| Detroit, MI 48226 | Washington, DC 20006 |
| mersino@butzel.com | steve@barrklein.com |
| 313-225-7015 | 202-804-6676 |
| Attorneys for Defendants | |

---

[8] Discovery is now closed and no such evidence has been presented to date.

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 15, 2020, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all registered ECF participants listed for this case.

By: /s/  Paul M. Mersino
**Butzel Long, P.C.**
Paul M. Mersino (P72179)
150 W. Jefferson, Suite 100
Detroit, MI 48226
mersino@butzel.com
313-225-7015